# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

FILED

FEB 09 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

|  |  |
|---|---|
| MEGHAN KATHLEEN WALSH, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| Plaintiff, |  |
| v. |  |
| | CASE NO. 1:25 CV 02485-DCN |
| JAVIER JOSE LEIVA, | |
| Defendant | JUDGE DONALD C. NUGENT |
| | MAGISTRATE JUDGE JONATHAN D. GREENBERG |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

NOW COMES Plaintiff Meghan K. Walsh, proceeding pro se, and respectfully submits this Memorandum in Opposition to Defendant Javier J. Leiva's Motion to Dismiss (ECF No. 8), brought pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Defendant's Motion relies on disputed facts, mischaracterizations of the Complaint, and legal arguments that are inappropriate for resolution at the pleading stage. When Plaintiff's well-pleaded allegations are accepted as true and all reasonable inferences are drawn in her favor, the Complaint plausibly states claims for relief and establishes grounds for jurisdiction sufficient to proceed to discovery. Accordingly, Defendant's Motion should be denied in its entirety, or, in the alternative, Plaintiff should be granted leave to amend.

1

**INTRODUCTION**

Defendant's Motion opens with a series of factual mischaracterizations that misstate both the allegations and the procedural history of this case. Those characterizations are unsupported by the pleadings and contradicted by the record.

Defendant, through licensed counsel, asserts that Plaintiff "accused" a non-party actress of being an accomplice in stalking Plaintiff. *See* ECF No. 8 § 2   1; changed her mind "on the eve" of release. *See* ECF No. 8 § 2   1; injected the actress's adopted minor child. *See* ECF No. 8 § 3   4; and "abused" Digital Millennium Copyright Act takedown procedures to remove Defendant's infringing content from various platforms. *See* ECF No. 8 § 3   5.

In fact, Plaintiff never alleged that the actress stalked or participated in stalking her, but rather explicitly stated "I have not *ruled out* that she's an accomplice," thereby exercising an abundance of caution so that no one whose interests were involved went unexplored as a potential contributor to the harm directed toward Plaintiff. *See* ECF No. 8 § 3   3. Plaintiff was demonstrably framed via fabricated evidence for posting racial slurs against the actress's adopted child. *See* ECF No. 1 § V(12)   2; and approached by the child's alleged biological mother via an Instagram message request from a third party acquaintance of the alleged biological mother and non-acquaintance of Plaintiff, who claimed the child's adoptive parents were surveilling and harassing her. *See* ECF No. 1 § V(16)   2. Plaintiff revoked consent repeatedly beginning weeks before release—not on the "eve" of the release. *See* ECF No. 1 § III   5-8; and invoked statutory protections only after Defendant continued publishing and monetizing content, despite ample pre-publication notice and repeated revocation.  *See* ECF No. 1 § III   11.

Defendant further alleges the "fatality" of a copyright claim in which the claim has not yet been registered. Plaintiff has since rectified this flaw and all three infringing works have been

registered by the United States Copyright Office. *See* **Exhibits A, B, and C** (certificates of copyright registrations).

This case is not about silencing speech. It is about scope-exceeding publication by post-revocation exploitation, and monetized dissemination of false or recklessly framed allegations, all after Defendant had actual notice and multiple opportunities to mitigate harm, which he himself acknowledged at various stages. At minimum, Plaintiff's allegations plausibly state claims that require discovery and cannot be resolved on a Rule 12 motion.

## STANDARD OF REVIEW

(Rule 12(b)(2) & 12(b)(6))

On a motion to dismiss, the Court must accept Plaintiff's well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. Credibility determinations, factual disputes, and weighing of evidence are improper at this stage. *See* Fed. R. Civ. P. 12(b)(6); *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Defendant's attempt to invoke Ohio law to force such processes is inappropriate and contradictory to Fed. R. Civ. P. 1, 8(a), 12(b)(6), 26, 38, 39 and 56.

## I. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANT

Defendant argues that exercising jurisdiction over him would violate due process because he is a North Carolina resident and the Podcast was not "targeted" to Ohio. *See* ECF No. 8 § 4(I) 5. This argument misapplies Sixth Circuit law governing intentional torts.

Plaintiff alleges that Defendant knowingly published and monetized content about an Ohio resident, communicated with Ohio law enforcement, and continued publication after being notified that the harm was occurring in Ohio. These allegations satisfy the "effects" test recognized in *Calder v. Jones* and applied by the Sixth Circuit, where a defendant commits

3

intentional tortious conduct knowing the brunt of the harm will be felt in the forum state. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984).

Defendant's conduct was not passive or fortuitous. Defendant affirmatively chose to publish content centered on Plaintiff, knowing Plaintiff resided in Ohio and that the reputational and emotional injuries would be felt there. Defendant cannot avoid jurisdiction by characterizing nationwide dissemination as jurisdictionally neutral when the alleged torts were intentionally directed at an Ohio resident. *See Neal v. Janssen*, 270 F.3d 328, 332-22 (6th Cir. 2001).

Plaintiff has already been denied electronic filing access in this Court, requiring in-person filings. Requiring Plaintiff to litigate in a distant forum would impose substantial and unreasonable logistical burdens, including repeated long-distance travel, lodging costs, and time away from work. Because electronic filing access for pro se litigants is discretionary and varies by district, Plaintiff cannot reasonably rely on receiving such access in another forum. These considerations weigh strongly against transfer and in favor of maintaining jurisdiction in Ohio.

Plaintiff did not create the circumstances necessitating this litigation. Defendant's continued publication and monetization of the challenged content compelled Plaintiff to seek judicial relief. Defendant may not direct alleged harm toward an Ohio resident, necessitate litigation to halt that harm, and then argue that the resulting litigation burdens should weigh against Plaintiff for purposes of jurisdiction or venue.

## II. PLAINTIFF'S CONSENT WAS LIMITED, CONDITIONAL, AND REVOKED PRIOR TO PUBLICATION

### A. The Written Release Was Narrowly Scoped

Defendant repeatedly asserts that Plaintiff granted blanket consent to publish "her story." *See* ECF No. 8 § 3   2. That is incorrect.

4

Plaintiff alleges that the written release authorized only the use of interviews and recordings Defendant personally obtained of Plaintiff's voice, name, and likeness. The release does not grant rights to Plaintiff's copyrighted works, unverified multimedia-sourced materials, third-party fabrications and compilations, or narrative construction untethered to the interviews. Uses outside the express scope of a license are unauthorized as a matter of law. *See* **Exhibit D** (signed recording consent form).

### B. Pre-Agreement Recordings Are Not Covered

Defendant asserts reliance on Plaintiff's recording consent, but Plaintiff alleges that Defendant recorded and published communications that took place before the release was executed. Those pre-agreement communications are outside the four corners of the release and are relevant to inducement, scope and reliance. Defendant concedes on a recorded phone call with Plaintiff, consistent with N.C. Gen. Stat. §§ 15A-286, 15A-287, Ohio Rev. Code § 2933.52, and 18 U.S.C. § 2511(2)(d), that he presented his podcast offer alongside representation of connections to and utilizations of federal law enforcement resources in his initial call with Plaintiff on June 28, 2025.

### C. Consent Was Induced by Material Representations and Is Voidable

Plaintiff alleges that her consent was induced by Defendant's assurances that the matter would be escalated to federal law enforcement and treated with appropriate investigative rigor due to the interstate nature of her case and complex utilization of technology by her alleged stalkers that local law enforcement was unsuccessful in uncovering. *See* ECF No. 1 § V(15)    10. These assurances were never fulfilled. Consent procured by material misrepresentation is voidable, and reliance on such consent after revocation is unreasonable as a matter of law. *See* Restatement (2d) of Torts, § 892B; *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505,

518.

### D. Plaintiff Revoked Consent Multiple Times Prior to Publication

Defendant claims Plaintiff changed her mind "on the eve" of release. *See* ECF No. 8 § 2

1. Plaintiff alleges the opposite: she revoked consent multiple times across multiple mediums

beginning weeks before the Podcast's initial release. *See* ECF No. 1 § III    5-8. Revocation was

clear, repeated, diverse, documented, and timely.

### E. Post-Revocation Publication Was Knowing and Unauthorized

Plaintiff further alleges that Defendant published at least one voicemail recorded after

Plaintiff's written revocation. *See* ECF No. 1 § III(9)    2. Publication of post-revocation

recordings cannot be reconciled with any theory of consent and supports an inference of knowing

exploitation.

## III. DEFENDANT FAILS TO STATE GROUNDS FOR DISMISSAL OF PLAINTIFF'S TORT CLAIMS

### A. Defendant's Statements Are Actionable and Not Shielded as Opinion or Sarcasm

Defendant characterizes challenged statements as skepticism, rhetoric, or sarcasm, going

on to express that the controlling inquiry is whether a reasonable listener would understand those

statements, in context, as asserting or implying verifiable facts. *See* ECF No. 8 § 4(III)(A)    8.

Numerous preserved comments from consumers of Defendant's posts about Plaintiff uphold that

his audience easily believed his misleading narratives, and accordingly made their judgments

about Plaintiff's honesty; an honesty which Defendant himself would later—and only privately,

but documentedly—deem as honesty he did not sufficiently convey in the podcast.

Defendant's defamatory statements were delivered within a purported "investigative" podcast and framed as factual conclusions by a figure who has positioned himself in the public eye as one capable of carrying out a sufficient "investigation." Defendant's failure to live up to this persona he created is not a burden to be carried by Plaintiff. Sufficient investigation by an "investigative journalist" is the responsibility of said "investigative journalist". *See St. Amant v. Thompson*, 390 U.S. 727, 732-33 (1968).

Defendant, through licensed counsel, asserts that "Plaintiff *admits* that her social media account posted racial slurs on photographs of Hargitay's daughter, but contends that her purported stalkers hacked her social media accounts." *See* ECF No. 8 § 3   5. This statement directly mischaracterizes Plaintiff's allegations and contradicts Defendant's cited paragraph of the Complaint. *See* ECF No. 1 § V(13)   2. At no point does Plaintiff "admit" or suggest that her social media accounts were hacked. To the contrary, Plaintiff expressly alleges that her accounts were not hacked. In *Cracks In The Fandom Part 1*, Plaintiff explicitly says, "I didn't get hacked. She [Jennifer Beavin] sent it [the message encouraging her to commit suicide] to herself and *photoshopped* my username and profile picture onto it." In *Cracks In The Fandom Part 3*, Defendant lays out his observation of the racial slur referenced in ECF No. 8 § 3   5. He says, "There's one disturbing screenshot of a post with Mariska's adopted daughter on social media. In the comments, Meghan Walsh's personal account writes, quote, 'fucking n-word,' unquote. Mariska's adopted daughter is black, by the way. I suppose someone hacked into her [Plaintiff's] account again, right?"

Neither Defendant nor his counsel can label the above as anything other than intentional misstatements of fact meant to confuse and mislead throughout the course of the act itself, and now in the scramble to manage the ramifications of such harm. Once a statement is framed as a

fact, a subsequent insertion of opinionated commentary can not retroactively prevent the statement from being framed as fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19. Contemporaneous listener reactions further support that Defendant's statements were understood as true. Even *if* Defendant's subsequent, sarcastic embellishment of "I suppose someone hacked into her account again, right?" could potentially rectify his prior statement, the absence of fact in the embellishing rhetoric itself deems it incapable of standing on its own because Defendant insinuates Plaintiff had been hacked "again", which implies hacking had been addressed earlier in the series. The only prior instance where hacking was addressed in the podcast series consisted of Plaintiff stating, "I didn't get hacked."

   Defendant's own Motion underscores the intentionality of this framing. Defendant concedes that "throughout the multi-episode series, Mr. Leiva expresses disbelief and skepticism about Plaintiff's claims," while simultaneously asserting that "shortly before the release of the Podcast's first episode, Plaintiff had second thoughts." *See* ECF No. 8 § 3   5. These statements cannot be reconciled without acknowledging that Defendant understood, in advance, how his presentation would shape audience perception and conveyed that in his communications to Plaintiff which ultimately prompted her to revoke her consent prior to publication.

   Defendant was not a neutral narrator expressing isolated opinion. He was the architect of a serialized "investigative" narrative, presented to an audience predisposed to trust his judgment and interpret his skepticism as evidentiary weight. Repeatedly framing Plaintiff's claims as suspicious, improbable, or exaggerated—while invoking his role as investigator—functioned to guide listeners toward a predetermined conclusion under the guise of inquiry. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990); *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).

Moreover, Defendant's suggestion that Plaintiff's revocation stemmed from the content of unreleased episodes is logically impossible. Plaintiff could not have reacted to episodes she had not heard. Her revocation was based solely on Defendant's demonstrable irresponsibility in handling the investigation itself, including his failure to pursue promised investigative avenues and his decision to frame unresolved questions as implicit doubt. This mischaracterization further supports that Defendant's "skepticism" was not benign opinion, but a narrative device conveying factual insinuations to his audience.

Defendant further relies on a mischaracterization of Plaintiff's factual disclosures to argue that a third party's reference to Plaintiff as a "failed actor" is somehow benign or self-inflicted. Specifically, Defendant points to Plaintiff's acknowledgment that she participated in middle- and high-school drama programs and treats that disclosure as an "admission" that Plaintiff is in pursuit of a career in the acting field. *See* ECF No. 8 § 4(III)(A)(i)  7. This argument construes both the Complaint and basic logic. Plaintiff's disclosure was made for the purpose of full transparency—to preempt precisely the type of background-search distortion Defendant now attempts. Plaintiff has never alleged being a professional actor, never pursued acting as a career, and never presented herself as such. Participation in childhood or school-based extracurricular activities does not transform a private individual into a professional actor, nor does it render defamatory characterizations non-actionable. Defendant's reasoning would produce absurd results. By the same logic, Plaintiff's participation in youth basketball would render her a "failed athlete." Courts do not endorse such semantic gamesmanship, particularly where the challenged statement carries a clear pejorative implication made in a purported investigative context. Plaintiff's inclusion of background information reflects candor, not concession. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990); *Bentley v. Bunton*,

9

94 S.W.3d 561, 579 (Tex. 2002); *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040–41 (9th Cir. 1998); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). Defendant may not convert transparency into an admission by selectively stripping context and redefining terms to manufacture a defense at the pleading stage.

## B. Plaintiff Plausibly Alleges Reckless Disregard or Actual Malice

Defendant asserts Plaintiff offers no factual basis for knowing or reckless falsehood. *See* ECF No. 8 § 4(III)(A)(ii)   3. Plaintiff alleges the opposite: Defendant acknowledged numerous times, in writing, receiving contradictory evidence, admitted that Plaintiff had been truthful, and nevertheless proceeded with publication that conveyed a misleading narrative. Defendant later admitted in a text to Plaintiff that he believed Plaintiff's honesty was not sufficiently represented in the podcast's production. These allegations plausibly establish reckless disregard at the pleading stage.

Defendant's assertion that he "investigated" Plaintiff's claims is demonstrably false or, at minimum, materially misleading. *See* ECF No. 8 § 3   1. Plaintiff alleges that Defendant repeatedly represented that he would escalate the matter to federal law enforcement channels, including the FBI, due to the interstate nature of the stalking, impersonation, and misuse of telecommunications infrastructure. *See* ECF No. 1 § V(15)   10. Had Defendant conducted the responsible investigation he claimed—through those very channels—such an investigation would have corroborated Plaintiff's account rather than undermined it.

Indeed, Defendant's own later findings and communications confirm that Plaintiff was being truthful. Despite reaching conclusions inconsistent with the narrative ultimately presented, Defendant chose to proceed with publication anyway, prioritizing speed, spectacle, and monetization over accuracy. Defendant subsequently acknowledged—both privately and

publicly—that Plaintiff was not lying; and, privately, that her honesty was not adequately conveyed in the final production. Proceeding with publication after reaching those conclusions plausibly constitutes reckless disregard for the truth and actual malice with knowing intent to harm.

Plaintiff further alleges that Defendant's election not to involve federal law enforcement, as promised, and instead accelerated publication for commercial and reputational gain shows actual malice with knowing intent to harm. A responsible investigation would have yielded evidence of authenticity and truth that Defendant admittedly ignored, minimized, and later attempted to obscure. These allegations plausibly support an inference that Defendant knowingly proceeded with a misleading and defamatory presentation despite possessing information that contradicted it.

Defendant's own public statements further support an inference of knowing disregard. In social media posts predating and following publication, Defendant acknowledged that he "anticipated" Plaintiff would challenge the *Cracks In The Fandom* series, reflecting awareness of potential wrongdoing despite proceeding with publication.

Defendant's treatment of similar conduct further supports reckless disregard. In the podcast, Defendant dismissed Plaintiff's allegations of harassment through unwanted enrollments as commonplace spam, yet later publicly suggested that similar enrollments directed at himself constituted targeted harassment by another subject. This inconsistent framing plausibly supports bias and knowing disregard for Plaintiff's allegations.

Defendant has also acknowledged mitigating potential harassment for other podcast subjects upon request *after* publication of episodes addressing them, while refusing to do so for

11

Plaintiff despite her pre-publication revocation of consent. This disparate treatment plausibly supports an inference of bias and actual malice.

## C. Plaintiff Is Not a Limited-Purpose Public Figure

Defendant argues Plaintiff is a limited-purpose public figure. *See* ECF No. 8 § 4(III)(A)(ii). Plaintiff alleges she did not initiate contact, did not seek publicity, and participated only after Defendant reached out through a third party. *See* ECF No. 1 § III(1). Responding to inquiries or seeking assistance as a crime victim does not constitute voluntary injection into a public controversy, *see Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166–67 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55 (1976), and a defendant may not manufacture public-figure status through its own publication or editorial choices. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).

## IV. DEFENDANT IS NOT ENTITLED TO DISMISSAL OF PLAINTIFF'S RIGHT-OF-PUBLICITY CLAIM

Defendant invokes Ohio's literary-work and newsworthiness exemptions. *See* ECF No. 8 § 4(III)(B)   3. Ohio's literary-work and newsworthiness exemptions do not apply where a defendant appropriates the commercial value of a plaintiff's identity or continues use after objection or revocation of consent. *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576–78 (1977); *Welling v. Weinfeld*, 113 Ohio St.3d 464, 471 (2002); *Parks v. LaFace Records*, 329 F.3d 437, 461–62 (6th Cir. 2003). At minimum, whether Defendant's continued monetization and post-notice distribution fall outside these exemptions presents factual disputes that preclude dismissal. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936–37 (6th Cir. 2003).

## V. PLAINTIFF PLAUSIBLY ALLEGES OUTRAGEOUS CONDUCT

Defendant argues his conduct does not meet the standard for IIED. *See* ECF No. 8 §
4(III)(C) 1. Plaintiff alleges Defendant's knowing publication after revocation, exploitation
during ongoing stalking, and deliberate editorial framing that dismissed Plaintiff's documented
harm, as acknowledged via email and text by Defendant to Plaintiff, and via social video posts
by Defendant to his audience. Taken as true, these allegations plausibly describe conduct that
exceeds mere criticism and cannot be resolved on a motion to dismiss.

Defendant's conduct was not limited to publication of disputed content, but included the
intentional use of his authority and platform to influence audience perception of Plaintiff's
credibility. Defendant repeatedly framed Plaintiff's claims as suspicious while presenting himself
as a trusted investigative arbiter, thereby encouraging listeners to adopt his skepticism as
fact-based judgment rather than unresolved inquiry.

Defendant's own Motion confirms his awareness of this influence. By asserting both that
he expressed skepticism "throughout the series" and that Plaintiff's revocation occurred "shortly
before" release, Defendant implicitly acknowledges that he knew his framing would shape
listener interpretation irrespective of evidentiary resolution. He further insinuates—falsely—that
Plaintiff revoked consent in reaction to episode content she had not yet heard, rather than in
response to Defendant's arrogant disposition, and reckless and irresponsible handling of the
investigation.

Leveraging an imbalance of power between a podcast host and a private
individual—particularly one reporting ongoing stalking—while framing her claims as suspect
and proceeding to publish anyway, plausibly constitutes conduct that exceeds mere criticism or
commentary. Taken as true, these allegations describe a calculated misuse of authority and
audience trust sufficient to satisfy the pleading standard for outrageous conduct.

13

Courts have repeatedly held that whether conduct is "extreme and outrageous" is a fact-intensive inquiry unsuitable for resolution at the pleading stage, particularly where a defendant knowingly exploits a plaintiff's vulnerability, abuses an authoritative platform, and deliberately frames the plaintiff's credibility before a public audience. *See Yeager v. Local Union 20*, 6 F.3d 282, 285 (6th Cir. 1993); *Reamsnyder v. Jaskolski*, 460 N.E.2d 424, 429 (Ohio 1984); *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).

## VI. OHIO'S UPEA DOES NOT APPLY IN FEDERAL COURT AND DEFENDANT'S POSITION IS INTERNALLY INCONSISTENT

Defendant simultaneously denies Ohio law applies for jurisdictional purposes while invoking Ohio's Uniform Public Expression Protection Act (UPEPA) to obtain dismissal and fees. *See* ECF No. 8 § 2  2. A litigant may not disclaim a forum's law while selectively invoking it for substantive relief. Courts routinely reject such inconsistent positions, holding that a party may not "have it both ways" by relying on forum law when advantageous and repudiating it when inconvenient. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 396 (2d Cir. 2011); *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990).

Defendant further concedes that no court has held Ohio's UPEPA applies in federal court. *See* ECF No. 8 § 4(IV)(b)  2. Under Erie, state procedural mechanisms that conflict with the Federal Rules do not apply in federal court. Defendant's reliance on non-binding authority from other circuits cannot overcome that conflict. [1]

---

[1] Fed. R. Civ. P. 8(a)(2), 12(b)(6), 12(d), and 56(d) bar evidentiary proof or fact-weighing before discovery, confining dismissal to the sufficiency of the pleadings and deferring proof until summary judgment after a fair opportunity for discovery. Ohio Rev. Code § 2747.01 et seq. (UPEPA) conflicts by imposing an early evidentiary burden at the pleading stage and is therefore displaced in federal court. See *Berk v. Choy*, 607 U.S. ___ (2026).

# VI. PLAINTIFF'S COPYRIGHT CLAIMS WERE FILED IN GOOD FAITH, AND ANY PREMATURITY WAS CURABLE

Defendant argues Plaintiff's copyright claims are premature. *See* ECF No. 8 § 4(II)(A). Plaintiff acknowledges the registration requirement, but alleges she timely applied during a federal government shutdown that prevented processing. *See* **Exhibit E** (U.S. Copyright Office newsletter). Defendant nevertheless continued publishing during that period. Any prematurity was procedural, temporary and curable. Dismissal would elevate form over substance and waste judicial resources.

Plaintiff further alleges that all of the following went unacknowledged and uncorrected by plaintiff: seven revocations of consent across multiple telecommunication mediums prior to the podcast's first publication; a combined DMCA takedown and Cease and Desist letter mailed to Defendant via USPS after publication; a counter-offer to Defendant's insufficient proposal for corrective actions; and a final warning phone call to Defendant's counsel. Plaintiff concluded that Defendant's inaction and unresponsiveness would result in continued publication of harmful content. A rightsholder is not required to wait for an infringer to stop voluntarily. Where infringement is ongoing and likely to continue, filing suit is a legitimate and reasonable means of halting continued harm. *See Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19; *MGA Entertainment, Inc. v. Mattel, Inc.*, 616 F.3d 904, 914; *Tri-Star Pictures, Inc. v. Unger*, 14 F.3d 199, 204.

# VIII. COPYRIGHT REGISTRATION HAS BEEN ISSUED

Plaintiff hereby provides notice that the United States Copyright Office has issued registration for all audiovisual works at issue in this action. On February 4, 2026, the Copyright Office approved Plaintiff's applications for *National Anthem, I Sang Onstage With F\*cking*

*Nickelback,* and *How This Selfie With Mariska Hargitay Ruined My Life,* each effective as of October 9, 2025.

Each registration was upgraded to Special Handling due to pending or prospective litigation, confirming both the urgency of issuance and Plaintiff's compliance with the statutory registration requirement under 17 U.S.C. § 411(a). Accordingly, Defendant's arguments premised on the absence of registration are no longer viable and should be disregarded.[2]

**CONCLUSION**

Defendant's Motion relies on factual disputes, mischaracterizations, and overbroad legal theories inappropriate for resolution at the pleading stage. Plaintiff has plausibly alleged claims that require discovery. The Motion should be denied in its entirety, or, at minimum, Plaintiff should be granted leave to amend.

Respectfully Submitted, this the 9th day of February, 2026,

Meghan Kathleen Walsh

MEGHAN KATHLEEN WALSH
Plaintiff, pro se
7261 Barton Circle
Parma, Ohio 44129
Telephone: (440) 823-4442
Email: themeghanwalsh@proton.me

---

[2]  Defendant does not argue fair use in his Motion to Dismiss. A defendant may not reserve affirmative defenses for later introduction while seeking dismissal on other grounds, nor may such arguments be raised for the first time in reply. Fair use is therefore not properly before the Court on this Motion.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of February, 2026, a copy of the foregoing was filed at the Clerk's Office of the United States District Court for the Northern District of Ohio, Cleveland Division. It was additionally served by electronic mail to Counsel for Defendant, Paige M. Rabatin at: pmrabatin@bmdllc.com and Amanda S. Hawkins at: ahawkins@brookspierce.com.

MEGHAN KATHLEEN WALSH